CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

March 04, 2025

LAURA A. AUSTIN, CLERK
BY: /s/ S. Wray
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JOSHUA L. BARRICKS,                         )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )        Civil Action No. 7:23-cv-00551
                                            )
JAMES R. WRIGHT,                            )        By: Elizabeth K. Dillon
                                            )            Chief United States District Judge
        Defendant.                          )

**MEMORANDUM OPINION**

Plaintiff Joshua L. Barricks asserts a Fourth Amendment excessive force claim and state-law battery claim against James R. Wright, then an Alleghany County Sheriff's Office Deputy, who stopped Barricks after seeing him skateboarding at night on Alleghany Avenue in Covington, Virginia. The stop eventually led to a physical altercation and Barricks's arrest in the back room of a local Farm & Fuel Service Center.

Pending before the court is defendant Wright's motion for summary judgment (Dkt. No. 24), which seeks summary judgment on several grounds. For the reasons set forth below, the court will deny the motion in full.[1]

I. BACKGROUND

The background below is taken from materials in the summary judgment record. The record includes four video recordings that capture most of the events at issue. (Dkt. Nos. 25-4 to

---

[1] Also pending before the court are plaintiff's two motions to exclude defendant's experts. (Dkt. Nos. 20, 22.) For two reasons, the court concludes that it is unnecessary to resolve them at this time, and it will deny them without prejudice. First, both of these experts are use-of-force experts and seek to offer opinions about the reasonableness of Wright's use of force, a description of distraction strikes and their appropriate use, and related topics. Even if the court were to consider that testimony, it would still rule in favor of plaintiff.

Second, Wright previously indicated that if the court were to deny him qualified immunity, he would immediately appeal that ruling. In the event that the denial of summary judgment is affirmed on appeal, the court will address those motions upon remand. If the court's ruling on summary judgment is reversed, there will be no trial and they will be moot.

25-7.)  These are a dash camera video from Wright's vehicle ("Dashcam"), two videos from Wright's body camera ("Bodycam 1" and "Bodycam 2"), although the start of Bodycam 2 has no audio, and a surveillance camera video from inside the seed room ("Seed Room Vid."), which does not have audio.[2]

## A. The Incident[3]

At about 9:40 p.m. on the evening of March 30, 2022, Wright was driving his marked police vehicle on Allegheny Avenue in Covington.  He saw Barricks skateboarding on the road, headed in the opposite direction, although Wright did not know it was Barricks at that time. (Wright Dep. 85–86.[4])  Despite the darkness, the man was not wearing reflective gear or lights. (Dashcam 00:25–00:27.)

Wright was on the phone with his then-girlfriend and co-worker.[5]  Wright said, "This motherf*cker's skateboarding down the Godd*mn road. . . . ."  (*Id.* at 00:28–00:31.)  Wright turned his vehicle around and followed Barricks to the front of the Farm & Fuel Service Center, a local convenience and supply store.  When Wright arrived, Barricks was no longer on the skateboard, which he had leaned against a garbage can; he was standing in front of the store, and he appeared about to enter.  (*Id.* at 1:11).  When the cruiser pulled in to face him and Wright briefly activated his siren, Barricks immediately stuck his hands up in the air.  (*Id.* at 1:13; *see*

---

[2] The time-stamps of the videos are inconsistent by an hour or more.  To avoid confusion, the court does not use the embedded time-stamps in the videos.  Instead, the court cites herein to the elapsed time of each video excerpt.

[3] As the court must on summary judgment, it views disputed facts in the light most favorable to Barricks, the non-moving party.

[4] No party has submitted the entirety of the depositions of Wright or Barricks, and each attaches different excerpts.  The cited pages of Wright's deposition can be found at either Dkt. No. 25-1 or Dkt. No. 34-2.  The cited pages of Barricks's deposition can be found at either Dkt. No. 25-3 or Dkt. No. 34-1.

[5] Wright testified about the nature of this relationship, describing it as a "nonphysical relationship" and providing additional details.  (Wright Dep. 166–68.)  The salient point is that the two were close, but the precise nature of their relationship is immaterial.  The court uses "girlfriend" as shorthand and for lack of a better term.

*also* Bodycam 1, at 00:02.)  Wright recognized Barricks at that point.[6]  (Wright Dep. 86.)

Wright stepped out of the vehicle, but he was still standing behind the car door, and he asked, "What are you doing?"  Barricks responded, "Skating."  Wright said, "Yeah, I know. You can't skate down the middle of the road."  (Dashcam 1:17–1:21.)  Another verbal exchange occurred, and Barricks continued to walk around.  Wright told him to stop, and Barricks sat down outside the store's front door and leaned against the wall.

Wright then completely exited the vehicle, turned on the audio on his body camera, and he approached Barricks sitting on the ground.  Barricks testified that he believed Wright approached him in a threatening manner.  (Barricks Dep. 134.)

Wright asked, "How messed up are you?"  Barricks replied, "I'm not."  Wright accused Barricks of "tweaking," a term used by methamphetamine users who are currently high, (Wright Dep. 92), and Barricks replied, "Yeah, so?"  Wright informed Barricks that he "can't be in public tweaking," and Barricks yelled, "I'm not!"  Wright responded, "You just told me you was."  Barricks said, "No, I didn't say I was. I said, 'Yeah, so.'"  They then engaged in an argument over whether that was an admission, and Barricks told Wright that he could ask the cashier because Barricks had been playing slots all day at the Farm & Fuel.  (Bodycam 1, at 00:32–00:56.)

In his deposition, Wright testified that he noticed Barricks's incoherent conversation, involuntary muscle contractions, tooth grinding, and aggressive behavior, and he concluded that Barricks was intoxicated.  (Wright Dep. 93–94.)  After the discussion described in the prior

---

[6] Wright testified that he knew Barricks because Wright had interviewed him when Barricks was arrested at his home about a month before, on March 3.  Wright also knew that Barricks had been involved in a "tussle" with other arresting officers, although Wright was not present during it.  (Wright Dep. 79.)  Because Wright had reviewed at least some of Barricks's criminal history before March 3, he also knew that Barricks had been charged with "several narcotic violations" and "at least one firearm violation."  (*Id.* at 80.)  During the interview, they discussed whether Barricks had required gang protection while in prison.  Barricks said no one protected him and told Wright that he would "be glad to show [Wright] how I protected myself in prison."  (Barricks Dep. 74.)  Barricks testified that he meant, "I can fight if I have to fight.  I'm not going to go down."  (*Id.*)

paragraph, Wright told Barricks that he had the "appearance of public intoxication," told Barricks to get up, and grabbed for Barricks's right forearm.  (Bodycam 1, at 00:57–1:01.)

At that point, the parties' accounts diverge.  During his deposition, Barricks initially testified that Wright did not touch him outside the store, at far as he could recall.  (Barricks Dep. 108, 122.)  But after seeing video, he said that he believed Wright was "helping [him] up from the ground."  (*Id.* at 134.)  Barricks knew that "the next part was going to be" his arrest, and he believed Wright had no justification for his arrest because he had not performed any field sobriety tests or anything else to confirm he was under the influence.  (*Id.*)  It is clear from the video that Wright grabbed Barricks's right arm, but it is unclear from the video whether Wright was simply helping Barricks to his feet or grabbing him to arrest him.  Regardless, Barricks jerked away and shouted, "Man, that's bullsh*t dude.  Go ahead and shoot me!"  (Bodycam 1, at 1:01–1:04.)  Barricks began backing towards the front door of the store, and Wright told him to stop.  At that time, Wright did not believe Barricks had committed any felony offenses, but he suspected him of two nonviolent misdemeanor violations: (1) playing on highways, in violation of Virginia Code Ann. § 46.2-932, and (2) public toxication, in violation of Virginia Code Ann. § 18.2-399.  (Def.'s Resp. to Req. for Admis. 30–31, Dkt. No. 34-3.)

Instead of stopping as directed, Barricks opened the door, swinging it toward Wright.  The bodycam does not show if the door hit either of Wright's arms, but it appears that Wright reached up to stop the door from swinging into him with his left hand.  (*See* Bodycam 1, at 1:04.)  Barricks then ran inside the store, fleeing to a back room where seed and other farm equipment was stored ("the seed room").  (Bodycam 1, at 1:04–1:13.)  Wright gave chase, and when he entered the seed room, it appeared that Barricks had tried to exit out the back, glass door to the outside, but the door was locked and he could not get out.

Barricks stuck his hands up and dropped to his knees just before Wright yelled stop and

told him to get on the ground. Barricks then put his hands on the back of his head and also told
Wright that he was already on the ground. (Bodycam 1, at 1:13–1:15; *see also* Wright Dep. 102–
03.) At the time he approached Barricks, Wright "observed [Barricks] with empty hands" and
could see that there was no weapon in Wright's hands, which he displayed with open palms, at
least briefly. (Wright Dep. 100–01.) Wright positioned himself behind Barricks while reaching
for Barricks's hands. (Bodycam 1, at 1:14.) The parties view the videos differently, in terms of
what they show occurring next. And Barricks testified at his deposition that he remembers
nothing from the time got on his knees in the seed room until he later woke up in the hospital.
Thus, the court does not have a version of events inside the seed room from his perspective.

Wright alleges that Barricks then "launched forward" while pulling his right hand away
and putting it under his own stomach. (Wright Dep. 110–11.) Wright insists that Barricks
moved forward on his own; Wright did not push Barricks or try to take him to the ground.
Wright again said, "Stop!" and stepped to the front left of Barricks, but the two men fell. For his
part, Barricks contends that the videos show Wright pushed him to the floor, face-first, even
though he was surrendering.[7] Either way, Barricks's head hits the asphalt floor with some force.
(Bodycam 1, at 1:14–1:19; Seed Room Vid. 00:32–00:35.)

In the moments following the fall or push to the floor, Wright continues to order Barricks
to stop and to put his hands behind his back. Wright states that Barricks pulled both wrists free
from Wright and refused to present his hands to Wright so he could be handcuffed. During the
struggle for control and to get Barricks cuffed, Wright held Barricks's head down for
approximately four seconds, used his knee on Barricks's back for approximately seventeen
seconds, and used what Wright refers to as "distraction strikes." (Def.'s Mem. Supp. of Mot. for

---

[7] In a footnote, Barricks also alleges that even if he had been voluntarily moving to lie down on the floor,
that would have been obedient to Wright's last directive, to get on the floor. (Pl.'s Opp'n to Mot. Summ. J. 22 n.16,
Dkt. No 34.)

Summ. J. 5–7, Dkt. No. 25 (summarizing Wright's position as to what occurred during this period of time); *see also* Bodycam 1, at 1:19–1:43; Seed Room Vid. 00:36–57.)

Wright testified that he was trained to use distraction strikes as a means to disorient and confuse a non-surrendering subject. (Wright Dep. 34, 40.) Such strikes are not intended to cause injury and are applied using the palm or side of a hand to specific areas of the body, which can include the head. (*Id.* at 115–16, 35, 37.) Wright also testified that Barricks's head was the "most available target" for distraction strikes, and it would have been "unadvantageous" to strike other parts of Barricks's body based on the way the two men were positioned. (*Id.* at 122–23.)

Eventually, Wright got control of Barricks's left arm, moving it to the center of his back, and he laid on top of Barricks. When he did so, the bodycam turned off; Wright then reactivated it. This is why there are two separate bodycam videos, according to Wright, which plaintiff does not dispute. (Def.'s Mem. 7 n.5; Pl.'s Opp'n to Mot. Summ. J. 6, Dkt. No. 34.)

Barricks contends that the videos contradict Wright's version of events during the period of time he was using the "distraction strikes" in three key ways. First, Barricks states that he was not resisting during that time, that he instead "hardly moved," and that his only sounds were moaning and groaning. (Pl.'s Opp'n 6 (citing Bodycam 1, at 01:15 -01:35; Seed Room Vid, at 00:35-00:55).) This description is supported by the videos to some degree, particularly in that Barricks does not say anything intelligible and appears to be moaning. But the video reflects that Barricks is moving some, and he certainly is at least passively resisting, in that he does not comply with Wright's instructions to put his hands behind his back. Second, Barricks argues that Wright in fact used his knuckles to strike him for some of the strikes, and not just the palm or side of his hand. Thus, the strikes were not proper distraction strikes, but punches. Third, he contends that the videos reflect that other appropriate targets on Barricks's body were available for the strikes and that they need not have been delivered only to his head.

In any event, after the strikes stopped and Wright was able to lie down on top of Barricks's body, Wright told Barricks to stop "resisting," using that word for the first time during the events. Barricks admits—and the video is clear on this point—that "Mr. Barricks kicked, squirmed, and rolled in the Seed Room for over three minutes while Defendant attempted to handcuff him." (Pl.'s Opp'n 7; *see also generally* Bodycam 2, at 00:00–2:29; Seed Room Vid. 00:58–4:10.) It is also clear from the video that there was a significant amount of blood on the floor early in those three minutes, and Barricks had a lot of blood on his face and shirt after the incident. (*See, e.g.*, Bodycam 2, at 1:04–1:05, 2:01–2:06, 2:13, 2:21.) At some point, he also was yelling for Wright to, "please, stop." (Bodycam 2, at 2:05.) At another point, Wright told him he was under arrest, and Barricks claimed not to know that. (*Id.* at 2:11.) Later, when Wright instructed him to put his hands behind his back, Barricks responded that he could not move, and Wright yelled at him to roll over. (Bodycam 2, at 2:22–2:23.) Wright eventually was able to handcuff Barricks. Wright found a bag of what he believed to be methamphetamine on the floor near the altercation. Shortly thereafter, other officers arrived. Upon searching Barricks outside the store, Wright found a pocketknife on Barricks. (Wright Dep. 136.)

Shortly afterward, Wright had a conversation with his then-girlfriend, who also had arrived on the scene. He told her, "I'm fine. Other than blood bein' all over me." (Bodycam 2, at 9:52-10:04.) She asked, "What'd you do to 'em?" He responded, "f*cked his face up." (*Id.* at 10:05–10:07.) Wright also later texted with another co-worker, who asked him if Barricks "was the dude you jacked up right[?]" Wright responded, "Yea." (Wright Dep. 178.)

Barricks was taken to a local hospital via ambulance. His blood tested positive for methamphetamine at more than twenty times the level the Virginia legislature has determined to be intoxicating, according to the toxicology consultant hired by plaintiff as an expert. (Richard McGarry Report 2, Dkt. No. 25-11; Dkt. No. 25-10, at 2 (blood serum test results).) A person

with such a high concentration may "become aggressive, defiant, exhibit muscle twitching or

convulsions, experience hallucinations or even psychoses."  (McGarry Report 2.)

At the local hospital, Barricks was observed to have a facial laceration, facial bruising,

and bruising on the knees.  As noted by one of Barricks's experts, imaging revealed a right

frontal 6 mm intracerebral hemorrhage, closed fracture of the right orbital rib, blood in the

maxillary sinus, and several fractures to two different parts of the mandible.  (Dr. J. Gordon

Burch Report 3, Dkt. No. 34-6 (summarizing radiological reports and diagnoses).)

Barricks was later transferred to Carilion Roanoke Memorial Hospital, which could

provide a higher level of care, and doctors there diagnosed him with a brain bleed and multiple

facial fractures.  When he woke up at Carilion, he could not see out of his right eye because it

was swollen shut, he could not move his jaw, and part of his face was numb.  (Barricks Dep. 23–

25.)

Barricks's expert witness, neurologist Dr. Gordon Burch, examined Barricks and

reviewed all of the medical records and other pertinent information.  He opined that Barricks

suffered significant injuries as a result of this incident and the blunt force trauma endured, and he

opined that these injuries could not have been caused by walking into a closed door.  (Dr. Burch

Report 5–6.)  The injuries included a traumatic brain injury with intracranial hemorrhage, which

was "small in degree but very significant in location," and alterations in the structural anatomy of

Barricks's jaw such that he cannot use lower dentures and he requires a soft diet.  (Dr. Burch

Report 5.)  Barricks also had resulting visual loss and continued alterations in sensations over his

right face and right upper lip.  (*Id.*)

Barricks's complaint asserts two claims, a 42 U.S.C. § 1983 claim alleging the use of

excessive force during arrest, in violation of the Fourth Amendment (Count I) and battery (Count

II).  He seeks compensatory damages in the amount of $5 million, punitive damages, attorney's

fees, pre- and post-judgment interest, and costs.  Barricks does not contest the lawfulness of the

stop or his arrest, just the force that Wright used during the course of effecting that arrest.  (Pl.'s

Opp'n 4 n.3.)

## B.  Barricks's State Conviction

After the incident, Wright swore out an arrest warrant against Barricks charging him with

a violation of Virginia Code Ann. § 18.2-460 (titled obstruction of justice, but the parties also

refer to it as "resisting arrest").  Ultimately, Barricks pled nolo contendere and was convicted in

Alleghany County General District Court.  The only documents in the record related to that

proceeding are the arrest warrant and judgment signed by the judge, (Dkt. No. 25-12), and an

affidavit from Barricks's counsel stating what he remembered as the basis for the plea.  (Taylor

Baker Aff., Dkt. No. 34-11.)

In response to his nolo contendere plea, Barricks was found "guilty as charged" on

August 8, 2022, and sentenced to 12 months in jail, with all 12 months suspended.  (Judgment,

Dkt. No. 25-12.)  Barricks did not appeal his conviction and never filed any state or federal

habeas petitions related to his conviction.

## II.  ANALYSIS

## A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

genuine issue of material fact exists only where the record, taken as a whole, could lead a

reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S.

557, 586 (2009).[8]  In making that determination, the court "may not credit the movant's contrary

---

[8]  Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.

evidence, weigh the evidence, or resolve factual disputes in the movant's favor, even if a jury could well believe the evidence forecast by the movant." *Quinn v. Zerkle*, 111 F.4th 281, 290 (4th Cir. 2024). Instead, the court must "view the undisputed facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.*

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007).

Wright asserts three overarching reasons as to why he is entitled to summary judgment. First, he argues that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Barricks's claims because his resisting arrest conviction arose from the same incident and means Wright was using lawful force to arrest him. He argues that no conviction would lie for obstruction or resisting *unlawful* force because Barricks was convicted under a statute that criminalizes a knowing attempt to intimidate or "impede by threats or by force a law-enforcement officer *lawfully engaged in duties as such* . . . ." (Warrant of Arrest, Dkt. No. 25-12, at 1 (emphasis added).) Second, Wright argues that the videos conclusively show that Barricks was not cooperative throughout the entire encounter and that Wright used only an amount of force reasonably necessary to effect the arrest. Third and finally, Wright contends that he is entitled to qualified immunity because a reasonable officer would not have known that the force he used in the situation was unreasonable, based on clearly established law at the time. The court addresses each of these in turn.

**B. Wright Has Not Met His Burden of Showing That Barricks's Claims Are Necessarily
Barred by *Heck v. Humphrey*.**

The threshold argument raised by Wright is a legal one. Specifically, Wright claims that,

because Barricks was convicted of obstruction/resisting arrest, in violation of Virginia Code

Ann. § 18.2-460, *Heck v. Humphrey*, 512 U.S. 477 (1994), bars his claims.[9] For *Heck* to apply

and bar Barricks's § 1983 claim and related battery claim, two requirements must be met: (1) a

judgment in favor of the plaintiff must necessarily imply the invalidity of the plaintiff's

conviction or sentence; and (2) the claim must be brought by a claimant who is either (a)

currently in custody on the charge at issue or (b) no longer in custody because the sentence has

been served, but nevertheless could have practicably sought habeas relief while in custody.

*Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 197 (4th Cir. 2015). The burden of identifying a

conviction and showing that success in this case would necessarily imply the invalidity of

plaintiff's conviction rests with the defendant. *Jarboe v. County of Orange*, 293 F. App'x 520,

521 (9th Cir. 2008) (citing *Sanford v. Motts*, 258 F.3d 1117, 1119 (9th Cir. 2001)).[10]

**1. It is likely that Barricks could have filed a habeas petition while "in custody" for
his obstruction charge and failed to do so.**

As is clear from *Covey*, the second requirement for *Heck* to apply can be satisfied in one

of two ways. First, the petitioner could be "currently in custody" under the conviction or

sentence under attack" when he files his civil suit at the time his petition is filed." *Maleng v.*

*Cook*, 490 U.S. 488, 490–91 (1989). From the available evidence, it appears that Barricks was

not in physical custody on the resisting arrest charge at the time he filed his complaint in this

---

[9] The court requested and received supplemental briefing on several issues related to Heck (Dkt. Nos. 43, 44), which the court has considered.

[10] If defendant meets that burden, then a plaintiff must prove that the conviction or sentence has been reversed on appeal, expunged, declared invalid, or otherwise called into question. *Heck*, 512 U.S. at 486–87. Barricks does not so argue; he simply contends that Wright has failed to satisfy his burden of showing that success in this case would necessarily imply the invalidity of Barricks's resisting arrest conviction.

case and so does not satisfy 2(a) of the test as set forth in *Covey*.  His one-year suspended

sentence would have ended one year after it was imposed, or on August 8, 2023, as even Wright

admits.  (Def.'s Suppl. Mem. 8, Dkt. No. 43.).  His complaint was filed on August 25, 2023, after

that one year had passed.

　　　*Heck*'s second requirement can also be met by a person no longer in custody, but who

could have filed for habeas relief while in custody and failed to do so.  That exception to the in-

custody requirement is based on *Wilson v. Johnson*, 535 F.3d 262, 267–68 (4th Cir. 2008),

wherein the Fourth Circuit noted that *Heck* would not bar a claim where a "prisoner could not, as

a practical matter" file for habeas while in custody.  In *Wilson* itself, the plaintiff was completing

service of his twelve months' imprisonment (with six months suspended) when the state

department of corrections extended his release date by three months.  Wilson filed grievances,

but the department did not initiate formal administrative proceedings.  Wilson could have filed a

habeas, but he did not have time to exhaust his administrative remedies first; thus, the court ruled

he was left without access to federal habeas.  *Id.* at 263–64, 268 n.8.  The court cited to cases

from other circuits where *Heck* was held not to bar a claim either because the defendant spent

only one day in jail and thus could not file a habeas petition as a practical matter, or where the

sentence only involved paying a monetary fine.  *Id.* at 268 n.8 (discussing *Powers v. Hamilton*

*Cnty. Public Defender Comm'n*, 501 F.3d 592 (6th Cir. 2007) (one-day sentence), and *Leather v.*

*Eyck*, 180 F.3d 420, 424 (2d Cir. 1999) (fine-only sentence).  *See also Greene v. Stirling*, No.

5:16-CV-00587-JMC, 2016 WL 2864894, at *2 (D.S.C. May 17, 2016) (finding that where

plaintiff only had four months to pursue habeas relief and his petition would not have been

addressed prior to his release, he should be able to pursue his § 1983 claim).

　　　Although Barricks was never in *physical* custody on this charge, that does not mean he

did not have the opportunity to file for habeas, despite Barricks's arguments to the contrary.

Virginia Code Ann. § 8.01-654(b)(3) permits a habeas attack on a suspended sentence because a person under a suspended sentence is subject to a sentence not yet fully served, much like a person on probation or supervised parole. *Escamilla v. Superintendent*, 777 S.E.2d 864, 868 (Va. 2015). Thus, unlike the cases cited in the preceding paragraph, Barricks had a full year during his suspended sentence when he was considered "in custody" for habeas purposes and could have filed. This was sufficient time for him to do so. Additionally, the federal statute of limitations would have been tolled while the state application was pending. *See* 28 U.S.C. § 2244(d)(1)–(d)(2).

Based on this, it is very likely that Barricks "could have practically sought habeas relief while in custody" and thus that Wright has satisfied 2(b) of *Covey*'s *Heck* formulation. *See Griffin v. Balt. Police Dep't*, 804 F.3d 692, 697 (4th Cir. 2015) (emphasizing that the "*Wilson* exception" applies "only if [the would-be plaintiff who is no longer in custody] lacked access to federal habeas corpus while in custody"); *see also Bishop v. County of Macon*, 484 F. App'x 753, 755 (4th Cir. 2012) (holding that a plaintiff with a thirty-six month period of probation who took no steps to pursue habeas could not overcome the *Heck* bar and reasoning that "*Wilson* does not permit a plaintiff to end-run *Heck* by simply sitting on his rights until all avenues for challenging a conviction have closed").

### 2. Wright has not shown that Barricks's obstruction conviction is necessarily inconsistent with a judgment in Barricks's favor on his claims.

The parties' primary dispute as to *Heck*'s applicability concerns its first requirement; they dispute whether relief on his claims here would necessarily be inconsistent with Barricks's resisting arrest conviction. On that question, it is possible for an incident to give rise to both a resisting arrest conviction and an excessive force claim. It depends on the specific conduct on which each is based. This is exemplified by the Fourth Circuit's unpublished decision in *Riddick v. Lott*, 202 F. App'x 615, 617 (4th Cir. 2006). In *Riddick*, the Fourth Circuit reversed a district

13

court's dismissal of a claim based on *Heck* at the motion-to-dismiss stage.  The appellate court

remanded for further proceedings, concluding that the timing of the underlying factual events

was unclear.

The *Riddick* court's reasoning bears repeating in full:

> In this case, the record is sparse. Without knowing the factual basis
> for Riddick's plea, we cannot determine whether his claim of police
> brutality would necessarily imply invalidity of his earlier conviction
> for assaulting an officer while resisting arrest. S.C. Code Ann. § 16–
> 9–320 (2003). It is not clear from Riddick's pro se complaint
> whether the officer's alleged punch preceded, coincided with, or
> followed Riddick's resistance and assault. If the officer's alleged
> punch caused Riddick to engage in the conduct that undergirds his
> conviction, then a successful § 1983 suit would necessarily imply
> invalidity of that conviction, since a person cannot be found guilty
> of resisting arrest if he is simply protecting himself, reasonably,
> against an officer's unprovoked attack or use of excessive force. *See
> State v. Williams,* 367 S.C. 192, 624 S.E.2d 443, 445–46 (S.C. App.
> 2005). If, however, there is no legal nexus between the officer's
> alleged punch and Riddick's resistance and assault; that is, the
> alleged punch occurred, independently, either before Riddick
> resisted arrest, or after his resistance had clearly ceased, then a
> successful § 1983 suit for excessive force would not imply invalidity
> of the conviction. *See Smith v. City of Hemet,* 394 F.3d 689, 697–99
> (9th Cir.2005) (en banc) ("[A] § 1983 action is not barred by *Heck*
> unless the alleged excessive force occurred *at the time* the offense
> [of resisting arrest] was being committed.... [If the officers'] alleged
> acts of excessive force ... occurred *before* or *after* Smith committed
> the acts to which he pled, [they] would not invalidate his conviction
> [for resisting arrest].") (citation omitted). In analogous cases, courts
> have ruled that *Heck* does not bar § 1983 actions alleging excessive
> force despite a plaintiff's conviction for resisting arrest because a
> "state court's finding that [a plaintiff] resisted a lawful arrest ... may
> coexist with a finding that the police officers used excessive force
> to subdue [the plaintiff]." *Martinez v. City of Albuquerque,* 184 F.3d
> 1123, 1127 (10th Cir.1999); *accord Nelson v. Jashurek,* 109 F.3d
> 142, 145–46 (3d Cir.1997); *Wells v. Bonner,* 45 F.3d 90, 95 (5th
> Cir.1995). In a similar vein, Riddick's conviction may coexist with
> a finding that the officer's alleged attack was unprovoked and
> occurred independently of Riddick's own resistance.

202 F. App'x at 616–17.

Although *Riddick* is unpublished, other courts of appeals have reached similar

conclusions in discussing *Heck*'s applicability.  One explained that a plaintiff alleging excessive

force "does not collaterally attack his conviction [or] deny that he resisted[;] . . .  [r]ather, he

claims that he suffered unnecessary injuries because [the] response to his resistance . . . was not

. . . objectively reasonable."  *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006); *see also*

*Martinez*, 184 F.3d at 1127 (reasoning that a finding that a plaintiff "resisted a lawful arrest . . .

may coexist with a finding that the police officers used excessive force to subdue him . . .

[because] a jury could find that the police officers effectuated a lawful arrest of [the plaintiff] in

an unlawful manner"), *cited with approval in Riddick*, 202 F. App'x at 617; *Lora—Pena v.*

*F.B.I.,* 529 F.3d 503, 506 (3rd Cir.2008) ("[C]onvictions for resisting arrest and assaulting

officers would not be inconsistent with a holding that the officers, during a lawful arrest, used

excessive (or unlawful) force in response to his own unlawful actions.")

     Relying on *Riddick*, Barricks first contends that his conviction was based on his conduct

in pulling away from Wright while *outside* the store and then running in the store and to the seed

room in an attempt to escape.  If that were true, then *Heck* would not necessarily bar his claim

under the reasoning of *Riddick*.  Under his theory, he would have completed his offense of

resisting arrest once he got on his knees in the seed room and put his hands on his head, and then,

independently, the excessive force occurred.  Thus, the conviction and a successful excessive

force claim would not necessarily be inconsistent.

     The difficulty here is that the record is not clear as to the conduct on which Barricks's

conviction was based.  And it is Wright's burden to show that the conviction and Barricks's

claims here are necessarily inconsistent, which—as the court discusses next—is a burden that he

has not satisfied.

     In determining the conduct underlying his offense, it is noteworthy that Barricks pled

nolo contendere.  The Fourth Circuit has recognized that "under Virginia law a defendant

[convicted based on a plea of nolo contendere] expressly admits the facts alleged in the information." *United States v. Cruz*, 469 F. App'x 161, 167 (4th Cir. 2012) (citing with approval *United States v. De Jesus Ventura*, 565 F.3d 870 (D.C. Cir. 2009)).[11]  In *Ventura*, the court determined that the defendant's nolo contendere plea meant he was "necessarily convicted of any facts charged in the Virginia indictment," but he was *not* convicted of additional facts stated in the prosecutor's factual proffer at the time of the plea.  *See also United States v. Morgan*, No. 3:22CR52 (DJN), 2022 WL 4472771, at *12 (E.D. Va. Sept. 26, 2022) (discussing treatment of nolo contendere plea in Virginia and relying on *Cruz*, among other cases, to conclude that such a plea means the defendant has admitted only the facts alleged in the indictment).  As a result, any evidence about what was said at the plea proceeding—such as the affidavit testimony Barricks offers from his counsel—is irrelevant.[12]  Instead, the court's focus must be on the charging document itself.

The charging document refers to subsection B of the statute through its language, but it does not include any facts as the basis for the charge.  Wright points to the fact that the arrest warrant was issued in response to his sworn statement before a magistrate.  That statement, according to an affidavit Wright has provided, informed the magistrate that Barricks "resisted arrest with force inside the seed room . . . by moving forward in an attempt to flee from handcuffing; ignoring commands to stop resisting[,]" and his various other actions up until the handcuffing.  (Wright Aff. ¶ 4, Dkt. No. 25-8.)  Wright cites to no authority allowing this court to rely upon the factual testimony given to a magistrate and leading to the issuance of an arrest

---

[11]  Both *Ventura* and *Cruz* were focused on whether a prior conviction was a crime of violence when applying the modified categorical approach.  Nonetheless, the effect of a nolo contendere plea translates to the context here.

[12]  In that affidavit, his state defense counsel avers that "to the best of [his] recollection, the factual proffer involved Mr. Barricks pulling away from Wright and running away outside the store," (Opp'n Ex. K, Baker Decl. ¶ 5).

warrant when determining the conduct *charged*, which is the only conduct the court may consider.[13]  Instead, he simply argues that because Barricks was found "guilty as charged," Wright's testimony to the magistrate constitutes the factual basis for charge.  That might be so if the charge itself referenced that testimony or the facts were included in the charge, but there is no reference to the testimony and no facts included.  In short, then, the documents themselves do not contain a clear answer as to which specific acts were the basis for Barricks's conviction.

Wright insists, though, that there are two distinct reasons why Barricks's conviction must have been based on his conduct in the seed room and thus why—according to Wright—*Heck* bars his claim.  First, he argues that Barricks was convicted under a subsection of the obstruction statute—Virginia Code Ann. § 18.2-460(B)—that requires the use of more force than Barricks used outside the store (pulling away and running inside the store in an attempt to escape).[14]  Second, he contends that Barricks resisted during the entirety of his time in the seed room, including during the period of the distraction strikes and holding his face to the floor and kneeing his back.  Thus, he argues that the events in the seed room are inextricably intertwined with his resisting arrest conviction, and so Barricks's excessive force claims are barred by *Heck.*

As to his first given reason, Wright relies on several Virginia appellate cases to argue that Barricks's conduct outside the store could not support a conviction under the charged subsection.  The applicable statute, titled "Obstructing justice; penalty" provides as follows, in relevant part:

A. If any person without just cause knowingly obstructs . . . any law-

---

[13]  Moreover, as Barricks notes, Wright's own prior testimony is likely inadmissible hearsay.  (*See* Opp'n 13 (citing Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801(c)).)

[14]  Barricks does not dispute that he was convicted under subsection B.  And although the arrest warrant does not specify a subsection, the court agrees that the typed language it contains parrots subsection B and *not* subsection A.  Based on this, and the finding by the judge—based on a nolo contendere plea—that Barricks was "guilty as charged," the court agrees that Barricks was convicted of violating subsection B of the statute.  Like Virginia cases do, the court relies in this opinion on Virginia law interpreting both subsection B and subsection C in determining what "force" is required.  *See Washington v. Commonwealth*, 643 S.E.2d 485, 488 (Va. 2007) (noting no significant difference between the two clauses aside from the reference to violations of certain offenses and the punishment); *Belton v. Commonwealth*, 2007 WL 3071493 at *2 n.2 (Va. App. Oct. 23, 2007) (noting that it is proper to use cases applying either subsection when analyzing for sufficiency of the evidence).

> enforcement officer . . . in the performance of his duties as such or
> fails or refuses without just cause to cease such obstruction when
> requested to do so by such . . . law-enforcement officer . . ., he shall
> be guilty of a Class 1 misdemeanor.
>
> B. Except as provided in subsection C, any person who, by threats
> or force, knowingly attempts to intimidate or impede . . . any law-
> enforcement officer . . . lawfully engaged in his duties as such . . . is
> guilty of a Class 1 misdemeanor.

Va. Code Ann. § 18.2-460.[15]

In determining whether Barricks's conduct outside the store could have constituted a violation of subsection B, two other principles are worth mentioning. First, it is clear that flight, without more, is insufficient to constitute obstruction of a law enforcement officer. *Lucas v. Commonwealth*, 876 S.E.2d 220, 225 (Va. Ct. App. 2022). The *Lucas* court upheld the defendant's conviction under § 18.2-460(A), where defendant had pushed off of the officer as the officer attempted to handcuff him and then tried to run away, but the court noted that flight alone would have been insufficient. The conviction was upheld because, in addition to the flight, Lucas's actions impeded the officer's ability to detain him and caused two officers to engage in a scuffle with him.

Second, a conviction under subsection B or C requires proof of both (1) an attempt to impede, which requires the specific intent to obstruct, and (2) the use of force. A conviction under subsection A does not require the use of force. *Thorne v. Commonwealth*, 784 S.E.2d 304 (Va. Ct. App. 2016) (upholding conviction under subsection A where defendant refused to roll down her window).

The court has reviewed the cases on which Wright relies. To be sure, some of them

---

[15] Subsection C is nearly identical to B, but it requires that the obstruction relate to certain specific underlying offenses. Subsection D deals with making materially false statements during an investigation, and subsection E makes it a violation to flee from an officer to keep from being "lawfully arrested." Va. Code Ann. § 18.2-460.

suggest that Barricks's conduct outside the seed store would not be sufficient to sustain a
conviction under subsection B. For example, in *Jordan v. Commonwealth*, 643 S.E.2d 166, 171–
72 (Va. 2007), the court concluded there was insufficient evidence to sustain a conviction under
subsection C where defendant was "less than cooperative" and stiffened his arms and began
pulling away from the officer and then would stop, repeatedly causing the officer to bump into
him. This did not involve a sufficient use of force and did not impede the officer from
performing his tasks, according to the *Jordan* court.

Like the *Jordan* court, the court in *Belton v. Commonwealth*, No. 1290-06-2, 2007 WL
3071493 at *2 n.2 (Va. Ct. App. Oct. 23, 2007), concluded there was insufficient evidence of
force to sustain a conviction for felony obstruction under subsection C. The court thus
"reduce[d] the conviction to" a violation of subsection A. 2007 WL 3071493, at *1. There, the
suspect pulled some items out of his pocket after the officer asked him about marijuana and set
them down on the trunk of the vehicle. He then immediately began to run. The officer gave
chase, defendant ignored orders to stop, and the officer eventually got to him and took him to the
ground. The defendant refused to comply with orders to give the officer his hands, instead
laying on his hands. The court reasoned, based on prior authority, that obstruction occurs under
subsection B or C when "though less than a technical or actual assault upon an officer, force is
used in opposition or resistance sufficient to impede or prevent a police officer from performing
his duties." *Id.* at *3. In the case before it, the force was insufficient.

For his part, Barricks relies on *Hamilton v. Commonwealth*, 817 S.E.2d 343, 353 (Va. Ct.
App. 2018), where the Court of Appeals of Virginia upheld the defendant's conviction under
§ 18.2-460(B). (*See* Pl.'s Opp'n 16 (quoting from *Hamilton* at length).) There, the defendant
refused officers' directives to move into the main room of his house and stated, "I don't care.
Shoot me," which the court held clearly illustrated "his intention to prevent the officers from

19

performing their investigation." Barricks made a nearly identical statement here, so his conduct is sufficient to show an intent to impede. *See id.*

In *Hamilton*, the defendant then moved into a bedroom and "used force against the officers when he pushed the door closed while the officers pushed to keep the door open from the other side." He then succeeded in barricading himself in the bedroom, and the officers had to kick down the door, while potentially risking harm if appellant had retrieved a weapon or shot at them through the closed door. *Id.* at 196–97. To be sure, the defendant in *Hamilton* used force to keep a door closed, but here, Barricks physically jerked away from Wright, yelled at him, and then opened a door physically into Wright, placing a door between him and Wright. He then fled through the store to another room, putting a second door between him and Wright.

Wright counters that merely using a closed door that must be opened by an officer as a barrier is insufficient to support a conviction under subsection B, relying on *Curtis v. Town of Colonial Beach*, No. 1445-94-2, 1995 WL 619742 (Va. Ct. App. Oct. 24, 1995). In *Curtis*, which involved a town ordinance modeled on the state obstruction statute, the defendant ran into a bathroom to destroy evidence (a vial of his own blood from a blood-alcohol test) and closed the door such that the officer had to use force to open it. 1995 WL 619742, at *1–2. The conviction was reversed, but because the defendant had not threatened the officer or used any force against him. *Id.* at *2.

The situation here is similar to *Curtis* in some respects, but Barricks engaged in more forceful conduct, including jerking away from Wright, yelling at Wright angrily, and opening a door that may have hit Wright or that Wright had to use force to stop. So, there was some force used by Barricks, and more than that used in *Curtis*, which was none.

Having reviewed all the relevant cases, the court believes it is possible that a Virginia court could find Barricks's conduct outside the store insufficient to sustain a conviction under

subsection B.  At the same time, though, the court cannot say *with certainty* that Barricks could not have been convicted—or, more importantly, *was* not convicted— based on his conduct in jerking away, yelling at Wright, opening the door into Wright, and running away to the seed room.  Given the limited record, the court finds there is at least a dispute of fact as to the basis for his conviction.

Ultimately, the court comes back to the burden of proof, which is on Wright.  He must show that Barricks's success on his claims in this case would necessarily render his conviction invalid.   And because the precise facts underlying the conviction are unknown, the court concludes that he has not met that burden.  This court and others have reached the same conclusion where the facts are simply inconclusive on the issue.  *E.g.*, *Reese v. Hannah*, No. 2:23-CV-00805, 2024 WL 3607471, at *4 (S.D.W. Va. July 31, 2024) (denying motion to dismiss where the timing of the alleged excessive force relative to plaintiff's assault on a government employee was "not clear," even though the entire incident involved only a single course of an alleged assault and arrest); *Farrar v. Worrell*, No. 7:19CV00626, 2022 WL 1464710, at *6 (W.D. Va. May 9, 2022) (reasoning that because defendants failed to show the factual basis for the plaintiff's state conviction under § 18.2-460, they were not entitled to summary judgment under *Heck*); *Warren v. PFC Houston Sauer, L509*, No. 4:19-CV-02722-DCN, 2021 WL 1310758, at *4 (D.S.C. Apr. 8, 2021) (concluding that *Heck* did not bar plaintiff's excessive force claim where the factual record was insufficient to determine the factual basis regarding the conduct to which the plaintiff pled guilty).  *But see Mayes v. Swift*, No. CIV.A. 6:10-2991-TMC, 2011 WL 7281938, at *3 (D.S.C. Dec. 12, 2011), *report and recommendation adopted,* No. CA 6:10-2991-TMC, 2012 WL 463528 (D.S.C. Feb. 13, 2012) (holding that where the officers only "used force to gain control of the plaintiff *during* the arrest," the plaintiff's resisting arrest conviction barred his excessive force claim) (emphasis in

original).  For the foregoing reasons, Wright is not entitled to summary judgment on *Heck*

grounds.[16]

## C.  There Are Disputes of Fact as to Whether Wright's Use of Force Was Constitutional.

A claim "that law enforcement officials used excessive force in the course of making an

arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth

Amendment's 'objective reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 388

(1989); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007).  Applying the objective

reasonableness standard "requires a careful balancing of the nature and quality of the intrusion

on the individual's Fourth Amendment interests against the countervailing governmental

interests at stake."  *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at

396).

The court considers three factors to guide this balancing, including (1) "the severity of

the crime at issue," (2) the extent to which "the suspect poses an immediate threat to the safety of

the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to

evade arrest by flight."  *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d

892, 899 (4th Cir. 2016) (quoting *Ray*, 781 F.3d at 101); *see also Jones v. Buchanan*, 325 F.3d

520, 527 (4th Cir. 2003) (explaining that the operative question in determining whether the force

utilized was "excessive" is whether a reasonable officer would have determined that the degree

of force used was justified by the threat presented under the circumstances).  Notably, the

officer's conduct is not judged with the "20/20 vision of hindsight," because officers are often

---

[16] Even if Barricks's conviction could not have been based on his conduct outside the store, and it must have been based on his conduct *inside* the seed room, Barricks has offered an alternative argument as to why *Heck* still would not bar his claims here.  Specifically, using Wright's own description of the charge, Barricks contends that his conviction for resisting arrest was based on conduct that occurred only *after* the excessive force had concluded.  Thus, he argues that his civil claims are not barred because the force "occurred, independently, before [he] resisted arrest."  *See Riddick*, 202 F. App'x at 616.  Because the court already has concluded that Wright has failed to show that Barricks's conviction was not based on his conduct outside the store, the court does not reach this alternative argument.

called on "to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97. Instead, the factors are analyzed using "the information possessed by the officer at the moment that force is employed." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Additionally, the use of force must be justified at each point in an encounter with a suspect, and "even where an initial use of deadly force is reasonable, the repeated use of force may be constitutionally excessive if circumstances change in a material way." *Harris v. Pittman*, 927 F.3d 266, 268–69 (4th Cir. 2019); *see also Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We . . . hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). But the Fourth Circuit also has cautioned that courts must avoid making "[a]rtificial divisions in the sequence of events" and should instead view the evidence "in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 2003); *see also Plumhoff v. Richard*, 572 U.S. 765, 774 (2014) (citing *Graham*, 490 U.S. at 396) (instructing that the inquiry as to whether a particular seizure was reasonable "requires analyzing the totality of the circumstances"); *Waterman*, 393 F.3d at 481 (harmonizing the two seemingly conflicting principles by noting that *Rowland* does not mean that the reasonableness of force cannot change during an encounter, but simply that the events must be viewed in the "context of the conduct that precipitated the seizure").

The court finds it helpful to consider the separate potential uses of force by Wright once in the seed room. The court sees three time periods when there were uses of force: (1) the time when Barricks moved (or was pushed) from his knees to the asphalt floor of the seed room, face first; (2) the period of time when Wright was on top of Barricks with his knee on his back, pushed Barricks's head to the floor, and used the twelve distraction strikes; and (3) the period of

time after that through the end of the incident, when Barricks alleges no *excessive* force was used. During that third period, Wright is repeatedly directing Barricks to stop resisting and give him his hands. Barricks does not dispute that he was resisting and not cooperating during that third period. Indeed, the video evidence shows that he clearly is resisting, squirming, and not cooperating with Wright's attempts to get him handcuffed. He is moaning and yelling and being generally uncooperative. Thus, the court needs to consider only the alleged uses of force in the first and second time periods.

With regard to the first period of time, the parties dispute whether Wright used force in taking Barricks to the floor. Wright flatly denies that he purposefully pushed Barricks to the floor or tried to put him on the floor. Instead, he insists that Barricks "launched forward" and away from Wright while pulling his right hand away and putting it under his stomach. Wright contends that because Barricks has no memory of that and the video does not obviously contradict Wright's version, the court must credit his testimony.[17]

The court has carefully reviewed the video evidence and concludes that it does not clearly reflect that Barricks purposefully moved away from Wright (or otherwise did anything to resist arrest during this period). Instead, the court believes the video is unclear as to what causes the fall and that a reasonable juror could interpret the video as showing Wright intentionally taking Barricks to the floor when he is surrendering and not resisting arrest. Wright insists that, after he

---

[17] Wright misunderstands the significance of the videos and their role at the summary-judgment stage. The principle in *Scott* is that a non-moving party's account of events (which would normally be credited at summary judgment) need not be credited if there is video evidence flatly contradicting it. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (discussing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). That does not mean, however, that testimony of a witness that is not contradicted by the video must be credited. If there are two possible interpretations of the video evidence on an issue, that issue remains disputed for purposes of summary judgment. Put differently, the court may not (or need not) *credit* the non-moving party's testimony if that testimony is clearly contradicted by video evidence, but if the video evidence is unclear and could support or undermine the moving party's testimony, then the video could be sufficient evidence to contradict the moving party and create a dispute of fact. Thus, Barricks can use the video (even if it does not flatly contradict Wright's testimony) as evidence creating a dispute of material fact.

pulled Barricks's hands down in an attempt to get them behind his back, Barricks pulled his right

arm away, citing to the body cam.  It is true that Barricks's right arm is moving forward at one

point, but it looks like that is occurring at the same time he is being moved forward.  So, it is

possible Barricks could have been trying to break his own fall.  But neither the seed room video

nor the body cam video shows clearly or undisputedly that Barricks was pulling away.

Additionally, a reasonable jury could interpret the position of Wright's body not as resisting

falling or movement forward by Barricks, but as controlling that movement.

 During the second period of time, there is some movement by Barricks, but it is unclear

to the court from the videos whether he is resisting or simply reacting in pain to the injuries to

his head from the fall and to the strikes by Wright.  Additionally, during this period (which is

captured on Bodycam 1), Wright can be heard telling Barricks to put his hands behind his back.

Barricks is not complying with that request and appears to be moving—although not

significantly—to get away from Wright.  Barricks kept his arm under his body, although again, it

is unclear whether he was purposefully keeping it there or whether it was pinned there by his

body, as he states later in the video.

 There are two questions before the court at this juncture.  First, could a reasonable juror

conclude that slamming a person to a hard floor, face-first, when that person is not resisting

arrest, but instead is on his knees with his hands on his head (or whose hands the officer is

holding in his own hands) was excessive force?  And second, if the jury believed Barricks was

not actively resisting during the second period of time, but simply was failing to comply with

commands—and possibly because he was injured—could a reasonable juror conclude that

Wright's uses of force during that period (holding his head to the floor, knee on the back, strikes

to the head) constituted excessive force?

 Applying the *Graham* factors to both periods of time when Barricks alleges excessive

force, the court concludes that they slightly favor Barricks, or at least a reasonable jury could so find.  The first factor—the severity of the crime—favors Barricks.  He was initially stopped for skateboarding on a public road, and suspected of being intoxicated in public, both non-violent misdemeanors, as Wright concedes.  Even if his conduct outside the store constituted resisting arrest, it was still a misdemeanor offense.  *See* Va. Code Ann. § 18.2-460(B).  Overall, and compared to many other possible crimes, including all felonies, these are not particularly serious crimes.

The second factor—how much of a threat Barricks posed—is mixed.  On the one hand, Wright emphasizes that he did not yet have Barricks handcuffed.  He also had not yet patted down Barricks, and—as it turned out—Barricks had a small pocketknife on his person.  Wright also notes that there were items on nearby shelves that could be used as weapons, and that Wright was by himself without backup support and without a functioning radio.  He also points to Barricks's intoxication (confirmed by lab results at the hospital), and his belligerent, defiant attitude, at least outside the store.

On the other hand, when Wright began using force (taking him to the floor), Wright knew Barricks had no weapons in his hands, as Wright has admitted.  (Wright Dep. 100–01.)  Barricks was also on his knees and Wright was behind him with full control of both hands initially, before Wright either let go of the right arm or Barricks pulled it away.  During the other uses of force, Barricks was lying on the floor on his face, and he was injured.  Barricks was not hand-cuffed, however, nor was he complying with Wright's instructions.  So, while Barricks certainly posed some threat, it is unclear whether the threat warranted the amount of force used during the encounter.

The third factor—whether Barricks was actively resisting or attempting to evade arrest by flight—is also mixed in terms of the overall incident.  To be sure, Barricks tried to flee when he

ran away through the store.  At the point Wright began to use force, however, Barricks was being

compliant and surrendering, or at least a jury could so find.  Thus, the court believes this factor is

either neutral or slightly favors Barricks.

The severity of his injuries, which the Fourth Circuit directs also should be considered,

also favors Barricks.  His injuries—which included a brain bleed and multiple facial fractures—

were serious.  He has an expert that states he experienced a traumatic brain injury with

intracranial hemorrhage, and the resulting injuries to his jaw prevent him from using lower

dentures and require him to eat a soft diet.  He also had visual loss and alterations in sensations

continuing at least through his deposition.

Barricks also points out some additional facts that the jury could consider supported an

excessive use of force.  For example, although Wright states he was attempting to handcuff

Barricks when the fall to the floor happened, Wright did not reach for or pull out his handcuffs at

the time he was standing behind Barricks, nor at any time until late in the encounter.

Furthermore, the narrative Wright wrote about a month later—and submitted for review months

after the incident—referenced Barricks's "mov[ing] forward," but in his recounting of the

incident to others immediately following it, Wright did not mention that detail.  (*Compare*

*generally* Bodycam 2 *with* Incident Rep. 3, Dkt. No. 34-5; *see also* Wright Dep. at 138–40

(admitting that the narrative section of the report was written on April 27, 2022).)

Analyzing the *Graham* factors as above, and considering all of the record evidence, the

court concludes that a reasonable jury could determine that Wright's uses of force in the seed

room were excessive.  Thus, summary judgment is not appropriate.

**D.  Wright Is Not Entitled to Qualified Immunity On Barricks's § 1983 Claim.**

Wright contends that he also is entitled to summary judgment because he is entitled to

qualified immunity.  The doctrine of qualified immunity "protects government officials from

27

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden of proof is on the party seeking qualified immunity. *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 219 (4th Cir. 2018).

In determining whether an official is entitled to qualified immunity, courts engage in a two-pronged inquiry. *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong asks whether the right was "clearly established" at the time of the defendant's conduct. *Id.* If the answer to either prong is "no," the official is entitled to qualified immunity.

As for the first prong, and for the reasons discussed in the preceding section, the court has concluded that there is at least a dispute of fact as to whether Wright's conduct violated a constitutional right.

As for the second prong, a right is clearly established where a rule's contours are "so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (cleaned up). It is important to identify a case "where an officer act[ed] under similar circumstances [and] was held to have violated the Fourth Amendment." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018). At the same time, it does not require that there be "a case directly on point." *Id.*

Consistent with this standard, the parties engage in an extensive discussion of Fourth Circuit authority as of March 2022. Barricks identifies a number of cases that he contends show qualified immunity is inappropriate, and Wright counters with ways in which those cases were arguably distinguishable, often because either there were multiple officers present, because there

28

was a size discrepancy between the plaintiff and the officer, or because other circumstances meant that the plaintiff was less of a threat than Barricks was to Wright, such as whether the plaintiff was fully handcuffed. *But see Sawyer v. Asbury*, 537 F. App'x 283, 294 (4th Cir. 2013) (stating that whether the detainee is handcuffed is not determinative as to the amount of force that can be used).

Wright insists that the situations before him were different. He was in a seed room with potential weapons in the vicinity, Barricks and he were about the same weight (Barricks 190 pounds; Wright 175–180), he was alone without other officers and his radio was not working, Barricks had just tried to run away once, and he was actively resisting (according to Wright).

But again, the disputed facts matter. If a jury found that Barricks truly had surrendered in the seed room when he got on his knees and put his hands on his head, and that Wright purposefully pushed or shoved Barricks onto the floor, face-first, then put his knee on his back, pushed his face into the floor again, and punched him (or used distraction strikes) twelve times about the neck and face, then a jury also could find that was excessive and unreasonable force for the situation. Barricks's injuries further support that conclusion, as already noted.

Of course, if the facts were as Wright stated—Barricks tried to launch forward to get away after "pretending" to surrender, and he repeatedly would not—as opposed to could not—get his hands behind his back and was refusing to comply with that verbal command—then the court thinks it likely that, at the very least, the law was not clear that Wright could not use that force. But if the jury were to find in Barricks's favor on those factual disputes, the law was clear that an officer could not use that amount of force to subdue a suspect on his knees and not resisting. Of all the cases cited and discussed by the parties, the court finds five most persuasive

in showing clearly established law prohibiting that conduct.[18]

First, in *Kane v. Hargis*, 987 F.2d 1005, 1006–08 (4th Cir. 1993), the court held that an officer used unreasonable force where the intoxicated suspect had attempted to flee, the officer had chased and pinned her to the ground, and he then pushed her head into the pavement, cracking her teeth. Wright argues that case is distinguishable because the officer was twice the size of the female plaintiff, she was fully pinned, and she posed no threat. But here, Barricks was on his knees, had allowed Wright to grab both wrists and put them behind his back, and then Wright took him to the floor, causing his face to hit the floor resulting in injuries. Arguably, Barricks posed little or no threat at the time he had surrendered. Wright then proceeded to hold Barricks's head down, push his knee on his back, and strike him repeatedly on his head. The mere size discrepancy is not enough to distinguish that case.

Second, in *Rowland v. Perry*, 41 F.3d 167, 171–74 (4th Cir. 1994), the court held that an officer used unreasonable force when he took an unarmed suspected misdemeanant to the ground using a wrestling maneuver with such force he cracked the suspect's knee. At the time, the suspect was only passively resisting, *i.e.*, he was not complying, but he also was not attempting to fight back. Wright focuses on the fact that the defendant officer was larger than the "relatively passive" intellectually-disabled plaintiff and that the plaintiff did not pose a threat to anyone.

---

[18] The other cases discussed by the parties are less factually on point, in the court's view. For many of them, there were multiple officers around or a suspect was fully handcuffed and under control, such that the force was more clearly unreasonable. *E.g.*, *Lewis v. Caraballo*, 98 F.4th 521, 534 (4th Cir. 2024) (holding that qualified immunity was not available to an officer who, in 2018, elbowed, kneed, and punched in the head a partially subdued 15-year-old, who was not resisting and who was being held down by a second officer); *Jones v. Buchanan*, 325 F.3d 520, 530–31 (4th Cir. 2003) (knocking plaintiff to the floor, jumping on him, and breaking his nose, was unreasonable force where the unarmed suspect was fully handcuffed inside a secure room at the sheriff's office, was not suspected of a crime, and had not resisted); *Sawyer v. Asbury*, 537 F. App'x 283, 294–95 (4th Cir. 2013) (holding officer used unreasonable force under the Fourteenth Amendment against an unhandcuffed pretrial detainee when the officer struck the plaintiff in the face in response to the suspect's "verbal tirade and/or his intransigence and failure to heed instructions," where plaintiff had been frisked, was standing against a wall, and was surrounded by officers); *Thomas v. Holly*, 533 F. App'x 208, 218–19 (4th Cir. 2013) (reasoning that officer was not entitled to qualified immunity when he punched an unarmed suspect 4 or 5 times in the back of the head while suspect was lying face down on the ground and already had been tased six times, pepper sprayed, was partially handcuffed, and was pinned to the ground by one officer with others nearby).

But again, if the jury found Barricks had surrendered and did not pull away or lunge forward, then the situation would be very similar.

Third, in *Smith v. Ray*, 781 F.3d 95, 98–99, 102–03 (4th Cir. 2015), the court held that an officer acted unreasonably when he threw a nonviolent misdemeanant to the ground, kneed her in the back, and punched her in the side, despite suspect being angry, pulling her arm away, and refusing to give up her hands. As Wright notes, the plaintiff in *Smith* was a "smaller woman" while the defendant was a 200-pound man; she gave clear responses, was not intoxicated, and had not tried to flee. But the key facts are not so different; instead, the court believes that a reasonable officer would have known Wright's force was objectively unreasonable.

Fourth, in *Yates v. Terry*, 817 F.3d 877, 887–88 (4th Cir. 2016), the court held that an officer was not entitled to qualified immunity where he used a stun gun three times without warning against a nonviolent misdemeanant who was fully compliant with instructions after a traffic stop. While unlike Barricks, that suspect had never tried to flee, he was—like Barricks—complying at the time force was used.

And lastly, in *Valladares v. Cordero*, 552 F.3d 384, 390–91 (4th Cir. 2009), the court determined an officer used unreasonable force when he shoved a surrendering suspect's face into a car, breaking the suspect's jaw, even though the subject had shoved the officer prior to surrendering. Wright points again to a size discrepancy—the plaintiff in *Valladares* was a 130-pound teenager and the defendant was a 250-pound officer. And he asserts that the officer "had him under full control," but nonetheless stood him on his feet and slammed his head against a car twice. Aside from the size difference, those facts are not so different from Wright having control of both of Barricks's hands, after Barricks had gotten on his knees and voluntarily placed his hands on his head as directed. And the fact that Barricks had previously fled inside the store is similar to the *Valladares* plaintiff shoving the officer earlier.

31

In short, although there are some minor factual differences as noted above, the court concludes that these cases are factually close enough to put a reasonable officer on notice that Wright's uses of force, if the jury were to find the facts in Barricks's favor, were unreasonable and violated Barricks's constitutional rights.

**E. Wright Is Not Entitled to Immunity As To Barricks's Battery Claim.**

Neither party initially addressed the applicability of concepts of Virginia immunity to the state-law claim, and the court requested additional briefing on the issue. The parties now have addressed the issue. The court is not certain that Virginia law is on all fours with federal qualified immunity for § 1983 claims. But the Fourth Circuit has flatly stated—in a case where the court determined that an officer was not entitled to qualified immunity on the plaintiff's § 1983 claim—that "[t]he parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well." *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (addressing claim arising under North Carolina law). Further, the parties both appear to take the same position, relying on *Rowland*—that the state-law claim (including any immunity analysis) should rise or fall with the federal claim. (*See* Def.'s Suppl. Mem. 9–10 & n.n. 4–5, Dkt. No. 43; Pl.'s Suppl. Mem. 7–8, Dkt. No. 44.) Since no party has advocated for a different analysis or result, the court declines to analyze the issue separately and will assume, without deciding, that the court's qualified immunity analysis also effectively governs the battery claim and leads to the same result. Thus, for the reasons already discussed, the court concludes that Wright is not entitled to any type of state-law immunity on Barricks's battery claim.

### III.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be denied, and plaintiff's motions to exclude experts will be denied without prejudice.  The court will enter an appropriate order.

Entered: March 4, 2025.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
Chief United States District Judge